WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.
August, 1877.

## FOWLER *v.* LOCKWOOD.

*In the matter of the final accounting of* SOPHIA B. LOCKWOOD, *administratrix, etc., of* GEORGE L. LOCKWOOD, *deceased.*

In general, an administrator will not be allowed a charge for clerk hire in keeping his accounts, as such, but for just and reasonable expenses incurred in the preparation of his accounts for submission to the Surrogate he may be allowed, under section 8, ch. 362 of Laws of 1863.

The " actual and necessary expenses as shall appear just and reasonable " (Laws of 1863, ch. 362, § 8), which may be allowed to an executor or administrator upon final accounting, include only personal expenses in the administration.   To entitle him, therefore, to be allowed for expenses of counsel in matters relating to the estate, it is not necessary for him to show affirmatively the justness or reasonableness of the sum paid.   It is sufficient that it appears that the services of counsel were justly rendered the estate.   The burden is on the party objecting to the account to show that the payment was excessive and unreasonable in amount.

The decedent had purchased $5,000 of government bonds with his wife's separate funds, and had also purchased like bonds for a servant in his

family and also for himself. Of those purchased for himself it was claimed that he had, in his life time, made a gift of $800 in value to his daughters. It appeared that all the bonds so purchased had been kept in one box, which, with the key thereof, the decedent had entrusted to the custody of his wife; that he had, from time to time, collected the interest on the bonds and paid over the same, as collected, to the wife, the servant and the daughters, according to the number of bonds claimed to be owned by each. *Held*, sufficient proof of a gift *causa mortis* to the daughters of $800 of bonds, and *further*, that the $5,000 of bonds so bought with the wife's separate funds were not assets of decedent.

Where the question arises between next-of-kin on a distribution, the validity of a gift *causa mortis* to one of the latter will not be so rigorously inquired into as where the interests of creditors are concerned. Hence, in such a case, in the absence of proof to the contrary, evidence that the decedent "gave" the gift in question — e. g., a pair of ponies and carriage — to his daughters, without disclosing the circumstances attending the giving, was held a valid gift. And this, notwithstanding the daughters were minors living at home, and that the ponies were kept on decedent's premises at his expense.

The Surrogate has, as an incident to his power to determine questions concerning distributive shares, etc. (2 R. S., 95, § 71), the power to determine the validity of alleged gifts *causa mortis* by a decedent.

Checks payable to the order of a distributee were delivered by the administrator to the husband of the distributee and payee, on account of the wife's distributive share. They were indorsed in the name of the payee by the husband and collected by him. It appearing that the husband had acted as his wife's attorney in several proceedings affecting the estate, and that on an account being rendered to her showing such payments she had made no objection, and that a considerable part of the money had been applied towards the improvement of her separate estate, *Held* that she was estopped from denying the agency of her husband, and that the administrator was entitled to a credit for the payments.

IN the matter of the accounting of Sophia B. Lockwood, administratrix, etc., of George Lockwood, deceased, it appeared that the intestate died in 1870, a resident of New Rochelle, leaving real and personal estate amounting to over $200,000, and leaving a widow (the administratrix) and several children by her and by a former wife. Among the latter was Margaret Fowler, wife of John Fowler, Jr., who was,

until recently, a lawyer, practising in the City of New York. In September, 1876, the administratrix filed her account of proceedings, having cited all in interest to attend the accounting. Mrs. Fowler appeared and filed objections to the account. Among other things, she claimed that some government bonds, and a pair of ponies, and carriages, had not been inventoried, nor accounted for. She also objected to several items, amounting, in the aggregate, to $2,000, paid for legal services, with which the administratrix had credited herself; also to a sum of $6000, and another of $4,063.91 credited to the administratrix as having been paid to her on account of her distributive share, alleging that she had never received those sums. Another objection was to two items paid to a clerk for writing up the account, amounting to $215. These were the only questions seriously litigated.

W. S. OPDYKE and WRIGHT & CLAPP, *for administratrix.*

S. W. DAVENPORT, *for Mrs. Fowler.*

THE SURROGATE.— As a general rule, clerk hire is not allowable. Precisely what is intended to be understood by "writing up the accounts," I am unable to say. If the term is intended to apply to the preparation of the account which was filed, it cannot be allowed, as that was a duty devolving upon the administratrix formerly, and now, under the Act of 1863, may be covered by an allowance to be made by the court. If the clerk was paid for keeping the account, it must still be disallowed, as I see no special necessity for it in this case.

The credits for moneys paid by the administratrix,

from time to time, amounting to $2,000, for legal services, it is claimed should be disallowed on the ground that it has not been made to appear that they were "just and reasonable." The counsel for the contestant refers me to the language used in § 8 of chap. 362, of the Laws of 1863, where it is declared that "in all cases, such allowance shall be made for their actual and necessary expenses as shall appear just and reasonable. This is amendatory of 2 *Rev. Stat.*, 93, § 53, and relates solely to the compensation of executors and administrators and their personal expenses. Section 55, (*Id.*, 92), provides that, on the accounting, they "shall produce vouchers for all debts and legacies paid, and for all funeral charges, and all just, and necessary expenses." The words "just and necessary," I take it, refer to the character, rather than the amount of the expenses. That legal services with reference to the estate were justly rendered, is sufficiently apparent from the account and the testimony. Vouchers are produced for these payments, and no testimony has been offered to show that the charges were excessive or unreasonable in amount, Metzger v. Metzger, (1 *Bradf.* 265). These items are therefore allowed.

Again, it was objected that the administratrix had not accounted for all of the assets, in that she had omitted to charge herself with certain government bonds. The burthen is on the contestant to establish the fact of the omission, and it must be proved with reasonable certainty and definiteness, Marre v. Ginochio, (2 *Bradf.* 165). The contestant called the administratrix as a witness to prove that there were

such assets.  Her testimony clearly shows that the bonds claimed by her individually, amounting to $5,000, were purchased with her separate funds, and belonged to her.  As to those said to belong to the minor daughters to the amount of $800, it appears the decedent gave them to his daughters during his lifetime.

The bonds were kept in a tin box, which was in the custody of their mother, and of which she kept the key.  The decedent had thus parted with the dominion over them, as much as he had done with the bonds belonging to his wife and those of the servant, for whom he had also bought bonds and which were kept in the same box.  True, he had bonds of his own there, but they were simply in the safe keeping of his wife.  He collected the money for the coupons, handing the same to his wife, the girls and the servant respectively, and doubtless retaining his own.  The circumstances attending the giving of the bonds to the daughters do not appear, nor any other facts bearing upon the question than those recited.  Thus he "gave" them the bonds; they came into the custody of the mother, and he took the coupons, obtained the money and handed it to the daughters. As often, therefore, as he received and handed to them the money, he declared and affirmed the gift. The case of Grangiac v. Arden, (10 *Johns.*, 293), to which I am referred as an authority by both sides, I think sustains this view.

As to the ponies and carriages, I am inclined to regard the gift as a valid one.  The rights of creditors are in no way affected, and as between the next of kin

among themselves, the rule as to the validity of a gift
should not be so rigidly adhered to as where the
interests of creditors are involved. The evidence on
this point is also very meagre. It is simply that the
deceased gave them to his daughters. As in the case
of the bonds, so here, the circumstances attending the
giving are shown. In order to enable the contestant
to succeed in establishing the fact that this property
belonged to the estate, she should have shown in some
way, if possible, that the alleged gift was invalid. In
this she has failed. The testimony is that they were
*given*. This implies that every thing necessary to
render the gift valid, was done. Perhaps it is fair to
infer that as these daughters were minors, they resided
at home with their parents, and that the ponies and
carriages were kept on the premises and at the father's
expense. Still, I do not think these facts would mate-
rially affect the question.

The counsel for the administratrix insists that this
court has no power to determine as to the validity
of the alleged gifts. In this I think he is in error.
The persons claiming to be donees are parties before
me as next-of-kin. It is provided by Sec. 71 of
2 Rev. Stat., 95, that on the accounting the Surrogate
shall make a decree, distributing the surplus remain-
ing, " to and among the creditors, legatees, widow and
next-of-kin to the deceased, according to their
respective rights; and in such decree, he shall settle
and determine all questions concerning any debt,
claim, legacy, bequest or distributive share, to whom
the same shall be payable, and the sum to be paid to
each person." Does not this become a " question

concerning" the distributive share of each of the next-of-kin, and how can I "determine the sum to be paid to each person," without investigation? Clearly, on objection to that effect, I must determine whether the administratrix has accounted for all of the assets, and if she has not, she must do so, and thus, the amount to be paid to each will be affected. I think this is clearly distinguishable from the case of a disputed claim of a creditor presented against the estate.

There remains one other question to consider; and that is, whether the administratrix shall be allowed the credits for the $6,000 and the $4,063 claimed to have been paid by her to the contestant on account of her distributive share. The first of these sums, it is claimed, was paid by a check for that amount, dated Feb. 2, 1872, drawn on George Opdyke & Company, by W. S. Opdyke, and payable to the order of Margaret Fowler, the contestant. This check was thus endorsed in the handwriting of John Fowler, Jr., "Margaret Fowler, Deposit in National Bank of Commonwealth to credit of John Fowler, Jr.;" and the latter, by a check for the amount, dated May 15, 1872, drawn on the Bank of New York National Banking Association, by Sophia B. Lockwood, the administratrix, and payable to the order of said Margaret Fowler, and was endorsed by John Fowler, Jr. in precisely the same way. These checks were offered in evidence as vouchers to prove the payments, and it was held they were not sufficient, alone, for that purpose. Proof was then introduced with a view of showing that John Fowler, Jr. acted as agent for his wife, in the transac-

·tion; that she subsequently ratified his acts in this ·regard; and that a portion of the proceeds were .applied to the erection of an addition, subsequently made to the house which Mrs. Fowler owned at New Rochelle, where she and her husband then resided, at a cost of between $4,000 and $5,000. The facts established in reference to the agency are, that at some time, probably prior to the death of the intestate, Mrs. Fowler executed a mortgage on her property to secure the payment of $6,000, which sum, so raised, was not received by Mrs. Fowler, but by her husband with her assent; that he was attorney for her in a partition suit relating to the real estate of the. deceased shortly after his death; that he drafted two letters which his wife copied and signed, addressed·to the administratrix, requesting and urging the payment to. her of some portion of her distributive share of the personal estate; that with a view of coercing such payment, proceedings were instituted before the Surrogate to have her relieved and discharged as one of the sureties to the bond given by the administratrix on obtaining her letters, in which proceeding the husband acted as his wife's proctor and counsel, and which were discontinued on an arrangement being made with the administratrix for such partial distribution. In pursuance of this, $7,000 was paid to John Fowler, Jr. for his wife, February 17, 1871, by check payable to her order, on which he endorsed her name " per John Fowler, Jr.," and deposited it to his credit. Out of this he paid a mortgage debt of hers of $5,000 (probably the amount remaining due on the $6,000 mortgage) and he applied the other $2,000

to defraying family expenses, and none of the money came into his wife's hands.    When the intestate died there was a suit pending between him and one Stever, which was probably revived, and in which John Fowler, Jr. acted as representing his wife's interests, in conjunction with the attorney for the administratrix.    At or about the time when the check for $4,063.91 was given, John B. Lockwood, a son and next of kin of the intestate was indebted to the estate, and some agreement was entered into among the widow and next-of-kin to the effect that he should assign his interest in the estate to the administratrix, in consideration of which, each one would contribute the sum of $2,000 to a fund for his benefit; and the husband acted for his wife in the matter and when the last named check was so given to him, he gave his check for the $2,000 to be contributed by his wife to said fund.    It strikes me that these facts show pretty conclusively that the husband was the agent of his wife in regard to the affairs of the estate.    If anything is lacking to establish such agency, I think the following facts as proven, must be regarded as conclusive.    In the summer or fall of 1873 — Mrs. Lockwood thinks in the summer — Mrs. Fowler applied to the administratrix for a statement showing what moneys had been paid on account of her share.    She then knew that the $7,000 had been paid.    At the time she made such application she stated to Mr. Lockwood that "her husband would not give her any satisfaction as to how much he had received, and she wished a statement; that he became very indignant whenever she asked him for a state-

ment and asked her if she had not any confidence in him." What other inference can be drawn from this language than that she had a knowledge that her husband had been receiving money for her, on account of her distributive share, other than the $7,000. But this is not all. Mrs. Lockwood procured from Mr. Opdyke, who had charge as her financial agent and counsel, a statement, which contained, as nearly as I can ascertain, the amount paid to her as her share of the net proceeds of the partition sale, the $7,000, $6,000 and $4,063.91 so paid by the checks referred to; and, on the other side of the account, some money paid for taxes, and what else, if anything, does not appear. This statement was given by the administratrix to Mrs. Fowler; who examined and conversed with her about it, but made no objection to any item. She, however, told Mrs. Lockwood that she did not wish any *more* payments to be made to Mr. Fowler for her. Some three months after, and on or about the first of December following, Mrs. Fowler called on Mr. Opdyke at his office in New York, and also told him she desired that no further payments should be made to Mr. Fowler, and the statement was then again the subject of conversation, and she made no objection to any item. Indeed, she testifies that she made no objection down to the time of filing her objections in this proceeding. True, she gives as a reason for her silence, that she supposed the administratrix would still have to pay her these sums. In this I apprehend she is mistaken. On this state of facts I do not think she has any legal or just claim. Mr. Fowler did act as her agent in this matter, of which all parties

knew and in many others of which she alone, perhaps, had knowledge. Under these circumstances, when she ascertained that these payments had been made to him, even if she had no knowledge of them before, how else can her silence be construed than as a ratification of his acts? Where an agency actually exists, the mere acquiescence of the principal may well give rise to the presumption of an intentional ratification of the act. If there are peculiar relations of a different sort between the parties, such as that of father and son (and why not of husband and wife?) the presumption of ratification will become more vehement, and the duty of disavowal on the part of the principal more urgent, when the facts are brought to his knowledge. (*Story on Agency*, § 256). In Cairnes *v.* Bleecker, (12 *Johns.*, 300), the rule was laid down that when a principal, with a knowledge of all the facts, adopts the acts of his agent, though these acts are contrary to his duty and instruction, he shall not afterwards impeach his conduct; "for had the principal disapproved, the defendants might, by their vigilance, for aught we know, have secured themselves. It is a salutary rule, in relation to agencies, that when the principal is informed of what has been done he must dissent and give notice in a reasonable time or otherwise his assent to what has been done shall be presumed."

Here, had the administratrix been informed promptly that Mrs. Fowler repudiated the authority and acts of Mr. Fowler, she might for aught we know, have recovered the money back from him, or from the banks which cashed the checks. The like doctrine is

laid down in the cases of Wardrop *v.* Dunlop, (1 *Hun.*, 325); Brisbane *v.* Adams, (3 *N. Y.*, 129), and Commercial Bank of Buffalo *v.* Warren, (15 *N. Y.*, 577), and numerous other cases.

But, the counsel for the contestant contends that it has not been shown that the husband had authority to endorse his wife's checks, and that when she failed to object to these items, on obtaining full knowledge of them, she was uninformed as to all of the facts relating to the manner in which these payments were made. I fail to see any force in these objections. It strikes me it was utterly immaterial as to whether the endorsement of the checks was within the scope of his agency, or whether she did or did not know how he had endorsed them. It was only material that she should know the payments had been made, not how they were made, to him.

There was contradictory evidence as to whether the contestant at the time of her interview with Mr. Opdyke in regard to the statement refused or not to give a receipt for these payments. It seems to have been desired by Mr. Opdyke to obtain what has been called a consolidated refunding receipt, embracing all the payments. He testifies he informed her he had given, or sent to her husband such a receipt for her to execute and return to him, and that she did not object to doing so. She says she declined to execute it. No such prepared receipt was then presented to her. In any event, I think it of no moment, as her declining to execute such receipt could not fairly be construed into an objection to the payments, and especially in view of the fact that she never objected to them until this proceeding was instituted.

I have looked into most of the numerous authorities referred to in the elaborate and able briefs furnished by the respective counsel, and the result is embodied in the views above expressed.

A decree accordingly, without costs to either party as against the other.